Ben PURSCELL, Plaintiff,

v.

**TICO INSURANCE COMPANY and Infinity Assurance Insurance Company, Defendants.**

Case No. 2:12–cv–04039.

United States District Court,
W.D. Missouri,
Central Division.

May 24, 2013.

Grant L. Davis, Shawn Gayland Foster, Valley Renshaw, Davis, Bethune & Jones, LLC, William Clayton Crawford, Foland, Wickens, Eisfelder, Roper, & Hofer, PC, Kansas City, Mo, for Plaintiff.

Charles A. Danaher, Peter H. Klee, McKenna Long & Aldridge LLP, San Diego, CA, James Maloney, William Clayton Crawford, Foland, Wickens, Eisfelder, Roper, & Hofer, PC, Kansas City, MO, for Defendants.

## ORDER

NANETTE K. LAUGHREY, District Judge.

Pending before the Court is a Motion for Summary Judgment by Defendants TICO Insurance Company and Infinity Assurance Insurance Company (collectively "Infinity") [Doc. # 62]. After viewing all the facts in the light most favorable to the Plaintiff, the Court GRANTS Infinity's Motion for Summary Judgment.

## I. Background

Plaintiff Ben Purscell purchased an insurance policy issued by Infinity and underwritten by TICO Insurance Co. The policy purchased was in effect from May 16, 2006 to November 16, 2006. It limited liability to $25,000 per person and $50,000 per accident for bodily injury, and $10,000 for property damage. The insurance policy contract provides, "we will pay damages for bodily injury and property damage for which an insured person is legally liable because of an accident up to the policy limits… We will settle or defend, as we consider appropriate, any claim or action which is covered under the policy. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted by payment of judgment or settlement. We have no duty to settle or defend any claim or action that is not covered under the policy."

### A. The Accident

On May 19, 2006, three days after his policy went into effect, Plaintiff was involved in an automobile accident, the circumstances of which are as follows. Amy Priesendorf, Plaintiff's co-worker, came to Plaintiff's house around 10:00 p.m. She was drunk and crying, and asked Plaintiff if they could go for a ride. At Priesendorf's direction, Plaintiff drove to a cemetery, where Priesendorf said a friend who had died in a car accident was buried. They talked, and Priesendorf calmed down. As they were driving back to Plaintiff's house, Priesendorf put her foot over Plaintiff's foot and pressed down on the accelerator. Plaintiff told her to stop messing around, and Priesendorf stopped. However, Priesendorf then scooted closer to Plaintiff and put her foot on top of Plaintiff's over the accelerator again. Plaintiff attempted to get his foot out from under hers but was unable to do so. He told Priesendorf to stop because they were approaching an intersection with a stop sign. Plaintiff attempted to stand on the brake to stop the car, but Priesendorf continued to press the accelerator down and the brake had no effect. Plaintiff saw headlights from another car at the intersection ahead and told Priesendorf another car was coming. Priesendorf looked at the car ahead and continued to press down on the accelera-

tor. Plaintiff estimates the car accelerated from 35 to 75 miles per hour. As they passed through the stop sign at the intersection, Plaintiff swerved to the left in an attempt to avoid hitting the other car. The other car was driven by Tim Carr, and his passenger was Amy Carr. Plaintiff's right passenger side hit Mr. Carr's driver's side. Both cars overturned and the Carrs' car caught fire. Priesendorf was thrown from the car and pronounced dead at the scene. Mr. Carr was seriously injured and airlifted to the hospital. Mrs. Carr also suffered injuries and was taken to the hospital by ambulance.

## B. Post–Accident Developments

On May 22, 2006, Infinity learned of the accident and ordered a police report. Plaintiff's claim file from Infinity reveals that on May 23, Infinity Claim Representative Karen Martin and Supervisor Cynthia Woodall learned that the accident involved a fatality to Plaintiff's passenger, Priesendorf, a severe injury to the driver of the other vehicle, Tim Carr, and a minimal injury to Amy Carr. Infinity's Regional Casualty Manager, Metta Weburg, noted that they would put $25,000 on reserve for Priesendorf and $25,000 to be split between the Carrs. On May 31, Infinity learned that Tim Carr's medical bills "are approaching 90K" and that Amy Carr had suffered a sprained wrist.

Between May 23 and June 7, 2006, Martin and Plaintiff had been trying to speak on the phone but continually missed each other. On June 7, 2006, Martin and Plaintiff finally made contact. Martin took a statement from Plaintiff, in which Plaintiff relayed the facts of the accident as described above. Plaintiff also stated that since the accident he had learned from a friend of Priesendorf's that her friend whose gravesite they had visited had been killed in a car accident while Priesendorf was driving drunk. He had also learned that Priesendorf had been hospitalized for

attempting suicide, and that none of her friends would drive with her because she would interfere with drivers by jerking the steering wheel out of their hands or "do[ing] stuff" with the accelerator.

On June 6, 2006, the Carrs' attorney, Kirk Rahm, wrote to Infinity offering to settle both the Carrs' claims for the full extent of the policy limits, $25,000 each or $50,000. He informed Infinity that Mr. Carr's injuries were over $97,000 and ongoing, and that Ms. Carr's injuries were over $3,000 and expected to be ongoing. Infinity responded to Rahm's letter on June 12, 2006, stating that it needed to further investigate issues of coverage before it could make a settlement offer and would contact Rahm after completing its investigation. Infinity's claim notes indicate that it was concerned whether "the actions of the insured passenger Amy may be considered as 'use' of the vehicle ... If her actions during this loss are considered to be 'use' of our car, we have coverage issues since her actions would be considered intentional and without our name insured's permission."

On June 12, Infinity mailed two letters to Plaintiff, one stating that a demand of $50,000 had been received, and the other stating that because of coverage issues, Infinity was declining to enter into settlement negotiations until further investigation had been conducted.

On June 14, Rahm wrote to request clarification on the issues of coverage Infinity had mentioned; receiving no response, on June 21, Rahm wrote withdrawing the Carrs' offer to settle. On June 28, Martin wrote to Rahm, stating, "We are not denying any liability in the case to the Carr's [sic], but with a fatality involved, limits are going to be settled on a prorata basis and most likely submitted to the court for settlement." On June 30, Rahm responded that given Priesendorf's role in

the accident, he did not believe any wrongful death claim on her part would be meritorious, and informed Infinity that the Carrs were open to settlement discussions.

Infinity's claim notes of July 6 reported that Priesendorf's parents were pursuing a claim for her wrongful death. On July 12, Martin recorded that the claimants' attorneys would be discussing how to split the policy limits three ways. On July 16, Rahm informed Infinity that he was filing suit on behalf of the Carrs. Plaintiff was served with the lawsuit on July 29. From July 12—November 16, 2006, Infinity's records reveal that its lawyer, Mike White, regularly requested updates from the claimants' lawyers as to the status of their negotiations over the policy limits. At one point, the lawyer retained by Infinity to represent Plaintiff stated that he wished to arrange a meeting among all the claimants' lawyers, but there is no indication this meeting ever occurred. Infinity's records also show that throughout this period, White discussed the possibility of filing an interpleader if an agreement regarding the division of the policy limits could not be reached.

On August 14, 2006, Plaintiff's criminal attorney, Carmen Smith, wrote to Infinity, stating, "In your representation of this claim, Mr. Purscell requests that you settle this matter within his policy limits." White responded informing her that Priesendorf was also asserting a wrongful death claim and that the claimants were in negotiations over dividing the policy limits. Smith did not respond to White's letter. On November 17, White wrote to Smith stating that he believed the claimants had been unable to reach an agreement and that Infinity would be filing an interpleader action, and requesting her input. Smith did not respond to this letter either. White filed the petition for an interpleader on December 4, 2006.

Plaintiff's trial took place on January 25, 2008. The jury found that Plaintiff and Priesendorf were each 50% liable, and assessed Tim Carr's damages at $830,000 and Amy Carr's damages at $75,000. On February 29, 2008, the Circuit Court of Pettis County, Missouri, approved the settlement of the Priesendorf's wrongful death claim for $7,764.50, in exchange for a release against Plaintiff. It apportioned Infinity's $50,000.00 insurance among the parties as follows: $7,764.50 to Priesendorf's parents, $25,000.00 to Tim Carr, and $17,235.50 to Amy Carr.

## II. Discussion

### A. Summary Judgment Procedure

Plaintiff has two remaining claims before the Court; one for bad faith failure to settle (Count I), and one for breach of fiduciary duty (Count III). Infinity seeks summary judgment on both claims and states in its motion for summary judgment that its Suggestions in Support include "full argument demonstrating that it is entitled to judgment as a matter of law." [Docs. ## 62 and 64]. However, in its Motion for Summary Judgment and its Suggestions, Infinity only identified the following grounds for summary judgment:

1) Plaintiff failed to demand that Infinity "accept the June 6 demand in whole or in part." [Docs. ## 62 and 64].

2) No reasonable jury could find that it was bad faith for Infinity not to accept the Carrs' claim between June 6 and June 21, 2006. [Docs. ## 62 and 64].

3) "It is good faith for an insurance company to implead its policy limits in a multiple claimant/inadequate policy limits situation. [Docs. ## 62 and 64].

4) "An insured can[not] assert an independent claim for breach of fiduciary duty . . . when . . . barred from assert-

ing a common law bad faith failure to settle claim." [Doc. # 64].

In Plaintiff's opposition to Defendants' Motion for Summary Judgment, some additional issues were raised. They are as follows:

1) Summary judgment should be denied because Infinity had an opportunity to settle the Carrs' case from June 6 to December 4, 2006, even though the Carrs withdrew their offer on June 21. [Doc. # 83].

2) Summary judgment should be denied because on August 14, 2006, Purscell demanded that Infinity settle the Carrs' claims for the policy limits. [Doc. # 83].

In its reply, Infinity responded to each of these issues, and the Court confirmed with both Plaintiff and Infinity that they had had a full and fair opportunity to address these additional issues even though not raised in Infinity's original Motion for Summary Judgment. Therefore, the Court has considered all grounds for summary judgment raised in the parties' briefing.

### B. Bad Faith Failure to Settle— Count I

█ The cause of action for bad faith failure to settle is based on the idea that an insurance company, "having assumed control of the right to settle claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise good faith in considering offers to compromise the claim for an amount within the policy limits." *Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554, 556 (Mo.Ct.App.1990). To succeed on his bad faith failure to settle claim, Plaintiff must prove the following elements: "(1) the liability insurer has assumed control over negotiation, settlement, and legal proceedings brought against the insured; (2) the insured has demanded that the

insurer settle the claim brought against the insured; (3) the insurer refuses to settle the claim within the liability limits of the policy; and (4) in so refusing, the insurer acts in bad faith, rather than negligently." *State Farm Fire & Cas. Co. v. Metcalf, by Wade,* 861 S.W.2d 751, 756 (Mo.Ct.App.1993) (quoting *Dyer v. General American Life Ins. Co.,* 541 S.W.2d 702, 704 (Mo.Ct.App.1976)). Infinity does not dispute that it had control over the negotiations, settlements, and legal proceedings brought against Plaintiff. However, it contends that any failure to settle was not the result of bad faith, and furthermore, there was no demand by the Plaintiff to settle within the policy limits.

█ Bad faith consists of the insurer's intentional disregard of the financial interests of its insured in the hope of escaping its responsibilities under the policy. *Zumwalt v. Utilities Ins. Co.,* 360 Mo. 362, 228 S.W.2d 750, 753 (1950). If the interests of the insurer and the insured conflict, then the insurer must "sacrifice its interest in favor of the [insured]." *Id.* at 756. Bad faith is provable by both circumstantial and direct evidence, and what constitutes bad faith will depend on the specific facts in each case. *Id.* at 754. Bad faith is generally a question of fact because it requires consideration of the insurer's "state of mind." *Truck Insurance Exchange v. Prairie Framing, LLC,* 162 S.W.3d 64, 95 (Mo.Ct.App.2005).

### 1. Carrs' Offer to Settle—June 6, 2006

Plaintiff argues that Infinity is liable for bad faith failure to settle because it did not accept the Carrs' settlement offer of June 6, 2006. This claim must fail because based on the facts viewed in the light most favorable to Plaintiff, no reasonable juror could find that Infinity acted in bad faith when it did not accept the June 6, 2006 offer, but instead sought to do more inves-

tigation of coverage and liability. This is so even though the Court recognizes that bad faith is a question of fact generally left for a jury to resolve. *See Truck Ins. Exch.*, 162 S.W.3d at 95.

■ As of June 6, 2006 when Infinity received the settlement offer from the Carrs, there were a number of unique and complicated issues involving Plaintiff's liability for the accident and Infinity's insurance policy. Infinity knew Priesendorf had died in the accident, and it had concerns about Plaintiff's liability for any wrongful death claim brought by Priesendorf's parents. There were also insurance coverage issues. If Priesendorf was "using" the car, then she might have protection under the policy as an additional insured, requiring any settlement to release her as well. On the other hand, if she were "using" the car, and if her acts were intentional and the cause of the Carrs' injuries, Infinity's policy might not provide any coverage for the accident. Since only Plaintiff survived the accident and the decedent could not tell her side of the story, the insurance company needed to evaluate Plaintiff's statement that Priesendorf "caused" the accident. In addition, if Priesendorf did have a claim against Plaintiff, what was its value? Finally, the Carrs' offer did not specify a deadline that would have indicated to Infinity that it needed to act within a matter of days to resolve these issues.

Infinity also had to protect the interest of its insured even though there were multiple claimants to a policy woefully inadequate to cover all the injuries. Under these circumstances, how could the insurance company protect the interest of Plaintiff from claims by Priesendorf if it exhausted the limits of the policy by settling with the Carrs? That question was complicated by the policy provision that said

Infinity's "duty to settle or defend ends when [its] limit of liability for this coverage has been exhausted by payment of judgment or settlement." To settle with the Carrs alone for the policy limits would have exposed Plaintiff to full liability for Priesendorf's wrongful death claim and left him without a defense for the wrongful death action. Indeed, it would have been in Infinity's best interest to simply tender the policy limits to the Carrs, because once the limits of Plaintiff's policy were exhausted, Infinity no longer had an obligation to even provide a defense to Plaintiff for the wrongful death claim.

Given the complexity of the case, the risk of leaving Plaintiff exposed to full liability for Priesendorf's claims, and the lack of a deadline specified by the Carrs, no reasonable jury could find that it was bad faith for Infinity to reject[1] the Carrs' offer pending an investigation, nor could a reasonable jury conclude that Infinity's investigation should have been completed during the 15 day window left open by the Carrs. *See, e.g., DeLaune v. Liberty Mut. Ins. Co.*, 314 So.2d 601, 603 (Fla.Dist.Ct. App.1975) (finding that a deadline of ten days in which to accept a settlement offer made less than two months after the accident was unreasonably short); *Glenn v. Fleming*, 247 Kan. 296, 307, 799 P.2d 79, 86 (1990) (it was reasonable for insurance company not to accept a settlement offer that was only open for two weeks and was made before discovery had progressed); *Messersmith v. Mid–Century Ins. Co.*, 42 Cal.Rptr.2d 472, 497 (Ct.App.1995) (where "the demand was withdrawn after the lapse of only 30 days and before the defendant had had a fair opportunity to evaluate the claim . . ., this was the legal equivalent of no demand at all"); *Harvin v. U.S. Fid. & Guar. Co.*, 428 S.W.2d 213, 215 (Ky.

---

1. For purposes of summary judgment, the Court assumes Infinity rejected the Carrs' offer, a matter that was contested by the parties.

1968) (no bad faith where "[t]he time of the purported offer of settlement left little or no opportunity for the company to determine what course of conduct it should take"); *Rogers v. Gov't Employees Ins. Co.,* 598 So.2d 670, 673 (La.Ct.App.1992) *writ denied,* 605 So.2d 1364 (La.1992) (no bad faith for failure to settle within "an arbitrary five day settlement deadline"); *Am. Mut. Ins. Co. of Boston v. Bittle,* 26 Md.App. 434, 439, 338 A.2d 306, 309 (Md. Ct.Spec.App.1975) (short settlement deadline by opposing counsel was "arbitrary and unreasonable, in that it placed the insurer in a position where it would have been required to accept the conditional settlement offer before it had an opportunity to interview the investigating police officer"); *Clauss v. Fortune Ins. Co.,* 523 So.2d 1177, 1178 (Fla.Dist.Ct.App.1988) (not bad faith failure to settle where the insurance company took one month to verify the claim).

### 2. Period after June 21, 2006

Plaintiff argues that the Carrs would have settled for the policy limits even after they withdrew their offer on June 21, 2006, and therefore Infinity had the "opportunity" to settle for the policy limits up until trial. Thus, according to Plaintiff, Infinity acted in bad faith by not seeking the same settlement that the Carrs had already withdrawn. This argument raises the question of whether there can be a claim of bad faith failure to settle against an insurance company when no offer of settlement was made by the injured third party. Missouri law is unclear on the issue. One commentator has found that such an offer of settlement is the fifth element of a bad faith claim in Missouri, *see* Hon. David Noce, 30 Mo. Prac., Insurance Law & Practice § 8:1 (2d ed.), but the Missouri

cases cited in support are not so clear. *See Metcalf,* 861 S.W.2d at 755–56; *Bonner v. Automobile Club Inter–Insurance Exchange,* 899 S.W.2d 925, 928 (Mo.Ct. App.1995). Furthermore, the Missouri courts continue to cite the same four requirements for a bad faith claim originally identified in *Dyer v. General American Life Ins. Co.,* 541 S.W.2d at 704, which does not include a requirement that the third party claimant make an offer of settlement.

 Nonetheless, at a minimum, it is clear that Missouri law requires an *insured* to make a sufficiently definite demand for settlement within the policy limits before an insurance company can be liable for bad faith failure to settle.[2] In *Bonner v. Automobile Club Inter–Insurance Exchange,* the Missouri Court of Appeals stated, "[w]e will not allow a claim for bad faith to stand when there was no demand made to settle, either within or outside of the policy limits. This is an essential element of the tort." *Bonner,* 899 S.W.2d at 928. Such a demand must also be sufficiently definite under the circumstances. *Id.* (determining that no demand for settlement had been made where the statements regarding settlement were "overly vague as to what settlement is sought" and did not "contain any information from which an amount of settlement can be gleaned."). For the following reasons, the Court concludes that there is no evidence that Plaintiff made a demand for settlement after June 21, 2006 that is sufficiently clear to satisfy Missouri law. Summary judgment on Plaintiff's bad faith claim must therefore be granted.

 After June 21, 2006, the only evidence of Plaintiff asking Infinity to settle

---

2. An exception to this rule is if the demand would be futile because the insurance company will not settle within the policy limits even if asked *See Shobe v. Kelly,* 279 S.W.3d 203, 211 (Mo.Ct.App.2009). This exception is not relevant to the time period after June 21, 2006.

within policy limits, is a letter written on August 14, 2006 by Carmen Smith, Plaintiff's criminal defense attorney. In the letter Ms. Smith requests Infinity to "settle this matter within ... policy limits." It is not clear now, nor was it then, what "matter" was being referred to in the order. It may have been referring to the Carrs' claims or was simply a statement asking for settlement of all claims. In fact, Infinity tried to clarify the issue by writing to Carmen Smith after receiving the August 14th letter to notify her of the Priesendorf wrongful death claim, no doubt in response to Infinity's obligation to keep the insured informed. Ms. Smith never responded to clarify that the settlement demand was just for the Carrs' claims. While Ms. Smith and Plaintiff now testify that they intended Infinity to settle with the Carrs, even if that meant that Plaintiff would face a claim by Priesendorf without any insurance coverage, no reasonable juror could find that this was communicated to Infinity prior to trial. Indeed, on November 17, 2006, Infinity again wrote to Ms. Smith informing her that a global settlement had not been reached and that Infinity planned to file an interpleader action unless they heard otherwise from her. Again, Ms. Smith did not respond.

Absent a definite demand from Plaintiff that he wanted Infinity to exhaust the proceeds of the insurance policy by settling with the Carrs even in light of the pending wrongful death claim, there was not a sufficiently definite demand to satisfy the requirement of *Bonner*. Indeed, it makes no sense that Infinity would refuse Plaintiff's request to settle with the Carrs when such a settlement would benefit Infinity by releasing it from providing Plaintiff a defense for the Priesendorf lawsuit. It was the lack of clear instructions from Plaintiff that prevented settlement with the Carrs after June 21, 2006—not any bad faith by Infinity.

### 3. Whether the Interpleader Action Was Filed in Bad Faith

Defendants also ask the Court to grant summary judgment on any claim by Plaintiff that Infinity acted in bad faith when it filed an interpleader action. However, the Court has already held that summary judgment is appropriate because Plaintiff never made a demand that was definite enough to satisfy Missouri law. Therefore, it is unnecessary to address Infinity's Motion for Summary Judgment as it relates to the interpleader action.

### C. Breach of Fiduciary Duty

Plaintiff argues that Infinity breached its fiduciary duties to timely settle and to adequately advise him of the claims against him. To articulate a claim for breach of fiduciary duty under Missouri law, the plaintiff must show "(1) the existence of a fiduciary relationship between the parties, (2) a breach of that fiduciary duty, (3) causation and (4) harm." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 411 (Mo.Ct.App.2000). "An insurer's right to control settlement and litigation under a liability insurance policy creates a fiduciary relationship between insurer and insured." *Freeman v. Leader Nat. Ins. Co.*, 58 S.W.3d 590, 598 (Mo.Ct.App.2001); *Duncan v. Andrew County Mut. Ins. Co.*, 665 S.W.2d 13, 18 (Mo.Ct.App.1983).

A plaintiff cannot succeed on an independent breach of fiduciary duty claim based on a failure to settle where there has been no bad faith failure to settle. On the contrary, the duty to settle is part of the insurance company's fiduciary duty. *See Shobe v. Kelly*, 279 S.W.3d 203, 211 (Mo.Ct.App.2009) (discussing bad faith failure to settle as a form of the "fiduciary duties to their insureds" owed by insurance companies); *Truck Ins. Exch.*, 162 S.W.3d at 93 ("When the insurer refuses to settle, the insured loses the

benefit of an important obligation owed by the insurer."). Where there has been no bad faith failure to settle, there cannot be a breach of fiduciary duty for failure to settle. Because the Court has determined that Plaintiff failed to present a submissible case for bad faith failure to settle, Defendant is also entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty to settle as it relates to bad faith.

 Plaintiff also claims that Infinity breached its fiduciary duty by "fail[ing] to adequately counsel, instruct, and advise" him after receiving the Carrs' settlement demands. He argues that Infinity did not satisfy this duty because it only sent him ambiguous form letters that he did not understand. As part of its fiduciary responsibilities, an insurance company is "obligated to keep [its insured] informed of the claim" against him, such as by reminding the insured of his policy limits, informing him of the risk of a judgment in excess of those limits, and recommending that the insured retain his own counsel. *Johnson v. Allstate Ins. Co.*, 262 S.W.3d 655, 666 (Mo.Ct.App.2008).

 Based on the letters Infinity sent Plaintiff, no reasonable jury could find that Infinity breached its duty to keep Plaintiff informed of the claim against him. Infinity sent Plaintiff several letters about his case. The first was sent to Plaintiff on June 9 and stated, "There is a possibility that damages from this loss may exceed your limits of liability coverage provided under this policy. You may wish to consult your personal attorney, at your own expense, to assist you in this regard. We are not suggesting this step is necessary, but we are advising you of your right to do so." It listed Martin's number for Plaintiff to call if he had questions. The second was sent on June 12 and included a copy of the Carrs' demand letter. It stated that no amount had been offered at that time, and invited Plaintiff to call the number on the letter "if you have any suggestions or recommendations regarding this claim." A reservation of rights letter was also sent at this time, which explained that Infinity was investigating issues of coverage regarding Priesendorf's driving, included a copy of Plaintiff's policy, suggested he contact his own attorney, and again provided Martin's number for Plaintiff to call if he had questions. Infinity also requested input from his criminal defense attorney but neither she nor Plaintiff ever responded.

These letters show that Infinity provided Plaintiff with information about the claim, his excess exposure, and the coverage issues in a timely fashion; included a number to call in case he had questions; and suggested he retain his own attorney. If Plaintiff was confused by these letters, he could have called Martin's number and asked for clarification, but he did not. This case is distinguishable from *Johnson v. Allstate Ins. Co.*, which held that the insurance company's conduct demonstrated a reckless disregard for the insured's interests where the insurance company "failed to fulfill its duty to inform [the insured] of the demand letter, his exposure for damages in excess of the policy limits, including punitive damages and prejudgment interest, or his right to retain counsel." 262 S.W.3d at 666. No reasonable jury could find that Infinity breached its fiduciary responsibility to keep Plaintiff informed of the claim against him.

### III. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. # 62] is GRANTED.