# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-2362

_____

Ben Purscell

*Plaintiff - Appellant*

v.

Tico Insurance Co.; Infinity Assurance Insurance, Company

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: November 12, 2014
Filed: June 22, 2015

_____

Before BYE, SHEPHERD, and KELLY, Circuit Judges.

_____

BYE, Circuit Judge.

Ben Purscell sued his motor vehicle liability carrier, Infinity Assurance Insurance (Infinity), contending the insurer acted in bad faith in handling claims brought against him by third parties injured in a motor vehicle accident. Purscell alleged Infinity exposed him to excess judgments when it failed to settle the third

party claims within his policy limits. The district court[1] granted summary judgment to Infinity, concluding the insurer did not act in bad faith or breach any fiduciary duty it owed to Purscell. See Purscell v. TICO Insurance Co., 959 F. Supp. 2d 1195, 1204 (W.D. Mo. 2013). We affirm.

I

On the evening of May 19, 2006, Purscell's vehicle collided with another vehicle, injuring both of its occupants, Tim and Amy Carr. Amy Priesendorf, a passenger in Purscell's vehicle and one of his co-workers, died as a result of the accident. The circumstances leading up to the collision were somewhat unusual. Earlier that evening, Priesendorf (whom Purscell had only known for a couple of weeks) visited him at his home. She was distraught and drunk. She asked Purscell to give her a ride. He agreed. She directed him to a cemetery, where she visited a friend's grave.

On the return trip to Purscell's home, Priesendorf's behavior became erratic. From the passenger seat, Priesendorf stretched her leg over and put her foot down on the accelerator, on top of Purscell's foot. Purscell told her to stop. She did. Later in the trip, however, Priesendorf unbuckled her seat belt, scooted closer to Purscell, and repeated the erratic behavior. Purscell tried to get his foot out from under hers but was unable to do so. As they approached an intersection with a stop sign, he again told Priesendorf to stop and put his other foot on the brake, but with no effect. Purscell saw the headlights from the Carrs' vehicle and told Priesendorf another car was approaching the intersection. Priesendorf saw the other vehicle, but continued to press down on the accelerator.

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

Purscell estimated his vehicle reached a speed as high as seventy-five miles per hour before entering the intersection. Purscell swerved left to avoid an accident, but the two vehicles still collided. Both vehicles overturned. The Carrs' vehicle caught fire. Priesendorf was thrown from Purscell's vehicle and pronounced dead at the scene. Tim Carr was seriously injured and airlifted to a hospital. Amy Carr also suffered injuries and was taken by ambulance to a hospital. Purscell was injured as well.

Following the accident, Purscell learned the gravesite Priesendorf visited on the night of the collision belonged to a person who had been killed in an accident while Priesendorf was driving drunk. He also learned Priesendorf had been hospitalized for attempting suicide following her friend's death, and that none of her other friends would give her a ride because she would jerk the steering wheel out of their hands or "do stuff" with the accelerator while they were driving.

Infinity insured Purscell's vehicle at the time of the accident. The policy limited liability to $25,000 per person and $50,000 per accident for bodily injury. Within days of the accident, Infinity learned the accident involved one fatality, one severe injury (Tim Carr's) and one minimal injury (Amy Carr's). Infinity immediately put the full $50,000 per accident policy limits on reserve, with $25,000 designated to Priesendorf's fatality and $25,000 designated to the Carrs.

Several key events relevant to Purscell's bad faith claim occurred within the months following the May 19 accident. First, Infinity received a settlement offer from the Carrs a very short time after the accident. On June 6, an attorney representing the Carrs contacted Infinity and requested the full limits of Purscell's policy. At that time, Infinity learned Tim Carr's medical expenses alone were over $97,000 and ongoing. Amy Carr was making a loss of consortium claim in addition to a claim for her own personal injuries, with medical expenses of $1,600, lost wages of over $1,500, and all categories of loss expected to be ongoing. But with the

accident having occurred just three weeks earlier, Infinity had not yet completed its investigation and had questions about whether its policy extended coverage because of the intentional nature of passenger Priesendorf's conduct. Infinity told the Carrs' attorney it needed to investigate issues of coverage further before it could make a settlement offer, and would contact the attorney after completing its investigation. At the same time, Infinity sent two letters to Purscell, one informing him a demand of $50,000 had been received, and the other telling him Infinity was declining to enter into settlement negotiations until further investigation of coverage issues had been conducted. Infinity also informed Purscell of the possibility the claims arising from the accident may exceed his insurance coverage, and of his right to seek independent counsel.

Second, the Carrs withdrew their settlement offer. On June 14, Carrs' attorney contacted Infinity requesting clarification of the coverage issues Infinity had mentioned. When Infinity did not respond within a week, the attorney withdrew the settlement offer.[2] A week later, Infinity contacted the Carrs' attorney and stated "We are not denying any liability in the case to the Carr's [sic], but with a fatality involved, limits are going to be settled on a prorata basis and most likely submitted to the court for settlement." Carrs' attorney responded that given Priesendorf's role in the accident, he did not believe any wrongful death claim on her part would be meritorious. The attorney did not extend another settlement offer, however, but merely informed Infinity the Carrs were open to settlement discussions. More specifically, Carrs' attorney stated if "Infinity is interested in settlement of the bodily

---

[2]The Carrs withdrew the settlement offer just two weeks after having initially made it, notwithstanding the fact that the initial settlement offer included two signed medical authorizations to enable Infinity to obtain the Carrs' medical records in order to allow Infinity to verify the Carrs' personal injuries. A representative of Infinity averred that in her experience, "it invariably takes more than two weeks to obtain medical records from providers through the use of such medical authorization forms." App. at 27-28.

injury claims or consortium claims of Tim or Amy Carr, I assume you will communicate to me offers of settlement rather than file litigation proposing distribution of part of the policy limits of coverage to heirs of Amy Priesendorf." App. at 279-80.

Third, on July 6, less than two months after the accident, Infinity learned Priesendorf's parents intended to pursue a wrongful death claim. Shortly after Infinity learned it was dealing with three claims against Purscell, the Carrs' attorney informed Infinity he was filing suit. Purscell was served with the Carrs' lawsuit on July 29. Over the course of the next four months, Infinity's records indicate it regularly requested updates from the lawyers for both the Carrs and the Priesendorfs regarding the status of their negotiations over how to split the $50,000 policy limits between the Carrs' personal injury claims and Priesendorf's wrongful death claim. Infinity's records also show that throughout this period, Infinity's attorney discussed the possibility of filing an interpleader to deposit the full policy limits in court if an agreement regarding the division of the policy limits between the three claimants could not be reached.

Fourth, Infinity received a request from Purscell to settle the Carrs' claims within his policy limits. On August 14, the attorney representing Purscell as a result of the criminal charges arising from the accident contacted Infinity on Purscell's behalf. The letter referenced the claim brought by the Carrs,[3] but did not reference the wrongful death claim by Priesendorf. The letter stated "In your representation of this claim, Mr. Purscell requests that you settle this matter within his policy limits." Infinity responded to the letter indicating Priesendorf was also asserting a claim, and the claimants were in negotiations over dividing the full policy limits. Purscell's criminal attorney did not respond.

---

[3]In addition, the Carrs' complaint was attached to the letter.

Fifth, the Priesendorfs made a formal settlement offer. On November 13, Infinity received a letter from an attorney representing Priesendorf's father. Similar to the settlement offer initially extended by the Carrs but later withdrawn, the Priesendorfs also demanded the full per person limits of Purscell's policy.

Finally, on December 4, less than a month later after receiving the Priesendorfs' formal demand for the per person policy limits, Infinity filed a petition for an interpleader action in Missouri state court. The interpleader action referenced the competing claims for Purscell's full policy limits brought by the Carrs and the full per person limit brought by the Priesendorfs and stated Infinity "is ready, willing, and able to pay, and hereby offers to pay, into the Court's Registry the applicable bodily injury coverage policy limits of $50,000." After receiving the formal settlement demand from Priesendorf's father but prior to filing the interpleader action, Infinity wrote to Purscell's criminal attorney requesting her "input or recommendations as to how settlement could be accomplished without the necessity of filing an interpleader." When the attorney did not respond, Infinity proceeded with its interpleader action without Purscell's input.

The lawsuit the Carrs filed against Purscell proceeded to trial in January 2008. The evidence at trial included Purscell's conviction for careless and imprudent driving, testimony from Amy Carr that Purscell was driving without having turned on his headlights, and Purscell's admission that he could have done a number of things to avoid the accident, such as stopping the car, turning the engine off, or pulling over to remove Priesendorf from the vehicle.[4] In closing argument, the Carrs' attorney suggested Purscell was minimally at fault for the accident, and placed his percentage of liability between one percent and five percent. Despite this suggestion by the Carrs' own attorney, the jury found that Purscell and Priesendorf were equally

---

[4]Purscell did not attend the trial. His testimony was presented to the jury by videotape.

at fault, and assessed fifty percent responsibility to each. The jury further awarded Tim Carr $830,000 in damages and Amy Carr $75,000 in damages.

In February 2008, a Missouri state court approved the settlement of Amy Priesendorf's wrongful death claim for $7,764.50 in exchange for a release against Purscell. The state court then apportioned Infinity's $50,000.00 policy limits among the parties as follows: $7,764.50 to Priesendorf's parents, $25,000.00 to Tim Carr, and $17,235.50 to Amy Carr, leaving Purscell with a substantial judgment against him and in favor of the Carrs in excess of his policy limits.

In December 2011, Purscell sued Infinity in Missouri state court alleging claims for bad faith and breach of fiduciary duty. After Infinity removed the case to federal court, it moved for summary judgment. The district court granted summary judgment. The district court first concluded Infinity did not act in bad faith when it failed to accept the Carrs' early settlement offer (before the offer was withdrawn just two weeks later) for a number of reasons, including: (1) knowledge of a fatality arising from the accident and Purscell's potential liability for a wrongful death claim independent of the Carrs' claims for the policy limits; (2) Infinity's need to complete its investigation of coverage issues involving Priesendorf's intentional conduct; and (3) the lack of a specific deadline from the Carrs for when the offer would be withdrawn if not accepted. See Purscell, 959 F. Supp. 2d at 1201.

The district court further concluded Infinity did not act in bad faith during the period of time after the Carrs withdrew their early settlement offer. The district court first considered the fact that the Carrs never renewed their offer to settle within the policy limits after having withdrawn it. Id. at 1202. Ultimately, however, the district court interpreted Missouri law as requiring Purscell to have made a sufficiently definite demand upon Infinity to settle the Carrs' claims within his policy limits, even in light of the potential outstanding wrongful death claim by Priesendorf, in order for Infinity to be liable for a bad faith failure to settle claim. See id. at 1202-03 (citing

Bonner v. Auto. Club Inter-Ins. Exch., 899 S.W.2d 925, 928 (Mo. Ct. App. 1995)). The district court determined the initial August 14 letter Infinity received from Purscell's criminal attorney referencing the Carrs' claims, coupled with a lack of response after Infinity informed the attorney Priesendorf was also asserting a claim, was insufficient to communicate to Infinity that Purscell "wanted Infinity to exhaust the proceeds of the insurance policy by settling with the Carrs even in light of the pending wrongful death claim." Id. at 1203.

Finally, the district court granted summary judgment in favor of Infinity on Purscell's breach of fiduciary duty claim, which Purscell brought on the grounds that Infinity failed to inform him adequately of the claims brought against him. The district determined the letters Infinity sent Purscell following the accident "show that Infinity provided [Purscell] with information about the claim, his excess exposure, and the coverage issues in a timely fashion; included a number to call in case he had questions; and suggested he retain his own attorney." Id. at 1204. Purscell filed a timely appeal.

II

We apply de novo review to the district court's grant of summary judgment. Occidental Fire & Cas. Co. v. Soczynski, 765 F.3d 931, 935 (8th Cir. 2014).

To prove his bad faith failure-to-settle claim under Missouri law, Purscell was required to show Infinity: (1) reserved the exclusive right to contest or settle any claims brought against him; (2) prohibited him from voluntarily assuming any liability or settling any claims without consent; and (3) was guilty of fraud or bad faith in refusing to settle a claim within the policy limits. Scottsdale Ins. Co. v. Addison Ins. Co., 448 S.W.3d 818, 827 (Mo. 2014) (en banc) (citing Zumwalt v.

Utils. Ins. Co., 228 S.W.2d 750, 753 (Mo. 1950)).[5]  An insured must show more than just negligence on the part of an insured to establish the bad faith element of the claim.  See Zumwalt, 228 S.W.2d at 753.  "The evidence must establish that insurer intentionally disregarded the insured's best interests in an effort to escape its full responsibility under the policy."  Rinehart v. Shelter Gen. Ins. Co., 261 S.W.3d 583, 595 (Mo. Ct. App. 2008) (citing Zumwalt, 228 S.W.2d at 754).  Implicit in the "refusing" aspect of the bad faith element is a showing that the insurer had a reasonable opportunity to settle within the policy limits.  See State Farm Fire & Cas. Co. v. Metcalf, 861 S.W.2d 751, 756 (Mo. Ct. App. 1993) ("There is no showing that State Farm had an opportunity to settle the claim against the estate within its policy limits.  Not having had an opportunity to settle the claim within policy limits, State Farm could not have refused to do so.").

Infinity argues it acted in good faith by trying to reach a global settlement of all three claims brought against Purscell, despite the insufficient limits of his policy. Infinity relies in part upon evidence which shows Purscell was living paycheck to paycheck and wanted Infinity to do whatever it could to completely protect him from liability, which included any personal exposure he had to a claim brought by Amy

_____

[5]The district court cited the Missouri Court of Appeals' decision in Bonner for the proposition that an insured must show – as a necessary element of a failure-to-settle claim – that he or she made a demand upon the insurer to settle within the policy limits.  Our court has also cited Bonner, as well as Dyer v. General American Life Insurance Co., 541 S.W.2d 702, 704 (Mo. Ct. App. 1976), for the same proposition.  See Am. Guarantee & Liab. Ins. Co. v. U.S. Fid. & Guar. Co., 668 F.3d 991, 1002 (8th Cir. 2012).  In Scottsdale, the Missouri Supreme Court clarified that a demand to settle within the policy limits is not actually an element of the tort, but merely a factor to consider when determining whether an insurer acted in bad faith. See 448 S.W.3d at 827 n.5 ("This Court has never required the insured to make a demand for settlement and declines United Fire's invitation to do so. The existence of a demand is, nevertheless, highly relevant in determining whether an insurer acted in bad faith in refusing to settle.").

Priesendorf's parents. Infinity contends it never had an opportunity to settle the Carrs' claims within the policy limits because the Carrs unexpectedly withdrew their only settlement offer before Infinity had a reasonable opportunity to complete its investigation. Infinity emphasizes that there is no evidence it ever tried to escape the responsibility of paying the full limits of its policy, and that when it was clear it could not settle all three competing claims, it filed an interpleader action and deposited the full policy limits into court.

In arguing that Infinity acted in bad faith, Purscell singles out Tim Carr's claim as the only claim among the three potential claimants that clearly exceeded his per person policy limits of $25,000. Purscell contends Infinity should have focused on at least getting Tim Carr's claim settled within the policy limits, even if he might face personal exposure to the other two claims. In failing to focus on Tim Carr's claim, Purscell contends Infinity placed its own interests (i.e., protecting itself from the potential bad faith claim it might face for failing to settle all three claims) over his interest in being protected from the one claim where he faced the most exposure.

We disagree that Infinity's focus on settling all three claims is evidence of bad faith. We also disagree with the premise that an insurer's attempt to reach a global settlement of competing claims, without ever denying the responsibility to pay the full policy limits, can serve as evidence that the insurer is placing its own interests over that of its insured. It was in Purscell's interest to have all three claims against him settled within the policy limits. When a global settlement could not be reached, Infinity appropriately filed an interpleader action. See Monumental Life Ins Co. v. Lyons-Neder, 140 F. Supp. 2d 1265, 1270 (N.D. Ala. 2001) ("Because filing an interpleader action is equivalent to the plaintiff's admitting that it is willing to pay the legitimate claimant, an interpleading stakeholder cannot logically be subjected to a claim alleging bad faith refusal to pay."); see also Rinehart, 261 S.W.3d at 595 (indicating bad faith requires proof that an insured tried to escape its responsibilities to pay the policy limits).

In addition, the record does not show Infinity ever had a reasonable opportunity to settle Tim Carr's individual claim within the policy limits in any event. See Metcalf, 861 S.W.2d at 756 (indicating there can be no claim for bad faith in refusing to settle a claim where the insured is not presented with an opportunity to settle). As the district court noted, the Carrs unexpectedly withdrew their only settlement offer shortly after making it, without giving Infinity a reasonable opportunity to investigate and evaluate their claims. See Purscell, 959 F. Supp. 2d at 1201-02 (discussing the early withdrawal of the Carrs' settlement offer and citing those cases which hold an insurer must be afforded a reasonable opportunity to investigate and evaluate a claim before responding to a settlement offer in order to be subject to a bad faith failure-to-settle claim). Finally, even though Purscell was not required to show he singled out Tim Carr's claim and demanded Infinity settle that claim within the policy limits, see Scottsdale, 448 S.W.3d at 827 n.5, the fact that Purscell never clearly communicated as much to Infinity "is, nevertheless, highly relevant in determining whether an insurer acted in bad faith in refusing to settle," id. When Purscell's criminal attorney sent the August 14 letter referencing the Carrs' claims, Infinity responded by noting the presence of the third claim asserted by the Priesendorfs. Instead of telling Infinity to focus on settling Tim Carr's claim at that time, neither Purscell nor his attorney responded. As a result, we conclude no reasonable jury could determine Infinity acted in bad faith by continuing to focus on a global settlement of all three claims.[6]

III

We affirm the judgment of the district court.

_____

---

[6]We affirm the district court's grant of summary judgment on Purscell's separate claim for breach of fiduciary duty for the reasons expressed by the district court. See 8th Cir. R. 47B.

-11-