

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| BRYAN ROY ESCABUSA, | ) | |
| | ) | |
| Appellant, | ) | **WD86688 consolidated with** |
| | ) | **WD86695** |
| v. | ) | |
| | ) | **OPINION FILED:** |
| SAFE AUTO INSURANCE COMPANY, | ) | |
| | ) | **December 3, 2024** |
| Respondent. | ) | |
| | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri
Honorable William B. Collins, Judge**

**Before Division One: Lisa White Hardwick, Presiding Judge,
Gary D. Witt, Judge, and Janet Sutton, Judge**

Bryan Roy Escabusa (Escabusa) appeals the judgment of the circuit court of Johnson County (circuit court) granting summary judgment to Safe Auto Insurance Company (Safe Auto) on his cross-claim against Safe Auto for bad faith failure to settle. Escabusa claims the circuit court erred in making certain findings in its summary judgment order that were not supported by the summary judgment record, and that it erred in granting summary judgment because there was a genuine dispute of fact as to whether Safe Auto acted in bad faith by rejecting an opportunity to settle plaintiff's claim against Escabusa within Safe Auto's insurance policy limits. We affirm.

## Factual and Procedural Background[1]

On May 22, 2012, near Tipton, Missouri, Escabusa turned the vehicle he was driving into the path of a vehicle driven by James Mueller (Mueller), causing injuries to Mueller. The vehicle Escabusa was driving was insured under a policy of liability insurance issued by Safe Auto with limits of $25,000 per person. Approximately one week later, Attorney One sent a letter to Safe Auto stating that he represented Mueller in connection with the accident and asserting an attorneys' lien on any damages Mueller might recover.

In early June 2012, Safe Auto notified Escabusa that its investigation revealed that the value of the claim could exceed the limits of the Safe Auto policy. Safe Auto informed Escabusa that if he carried an excess liability policy or umbrella coverage that could apply to the claim, he should notify the insurer. It also advised Escabusa that it might be necessary to consult an attorney if he did not have any excess liability coverage.

On July 9, 2012, Safe Auto offered its $25,000 policy limits to Attorney One. Safe Auto requested to be advised of acceptance and stated that a release would then be prepared and a check issued to conclude the claim. Ten days later, Attorney One accepted Safe Auto's offer on Mueller's behalf, but Attorney One also advised that Mueller reserved the right to seek further legal action against Escabusa for "the additional actual damages." Attorney One gave authority and information to Safe Auto for it to negotiate with Mueller's medical creditors. Attorney One also told Safe Auto that notwithstanding his acceptance of Safe Auto's settlement offer and Safe Auto's work to reduce Mueller's medical liens, Attorney One said, "I am doubtful that we will

---

[1] "When reviewing the entry of summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Show-Me Inst. v. Off. of Admin.*, 645 S.W.3d 602, 604 n.2 (Mo. App. W.D. 2022) (citing *Green v. Fotoohighiam*, 606 S.W.3d 113, 116 (Mo. banc 2020)).

be able to avoid a law suit in this situation. . . . In my opinion, it will be quite an accomplishment if you get all creditors to settle within the limits of your policy of $25,000."

On July 23, 2012, Safe Auto spoke with Attorney One who confirmed his acceptance of Safe Auto's offer but expressed that he "was worried about liens." The next day, Attorney One told Safe Auto that Mueller's medical bills were high and that a suit would need to be filed if Mueller was forced to declare bankruptcy. The Safe Auto adjuster's notes stated, "we really need to get this resolved within the limits and get full release."

In July, August, and September 2012, Safe Auto communicated with Mueller's medical creditors six times to try to negotiate down Mueller's medical liens. In mid-August, Attorney One told Safe Auto that he would "definitely have to file suit as there is nothing that can be done with the bills."

On August 23, 2012, a new attorney, Attorney Two, sent a letter to Safe Auto, claiming to represent Mueller, writing, "Before we can evaluate the offer of $25,000.00 policy limits I need a little information."

On October 2, 2012, yet another attorney, Attorney Three, sent an email to Safe Auto asking for various documentation just as Attorney Two previously did. Attorney Three requested, among other things, copies of all motor vehicle insurance policies that Escabusa and his family had in effect on the date of the wreck, all letters Safe Auto received/sent to Attorney One, statements taken from Mueller, and any letters Safe Auto sent/received from any of Mueller's health care providers. The email stated Mueller understood he would be responsible for all valid and legally enforceable medical liens and bills. It withdrew permission for Safe Auto to speak with Mueller's medical providers. The email also stated:

> [A]ssuming you will timely produce the above policies, letters, bills and
> documents, our client will settle with [Escabusa] for the total insurance coverages

3

under all applicable policies with an agreed to Mo. Rev. Stat. [section] 537.065[2] contract to limit recovery. This offer is open for ten (10) days.

The next day, Safe Auto replied that before it could respond to Attorney Three's request for more information, it needed a letter from Attorney One showing that he no longer represented Mueller. After receiving a letter from Attorney One that he no longer represented Mueller, on October 4, 2012, Safe Auto wrote to Attorney Three providing him with the requested documentation. Safe Auto also requested Mueller's spousal information, Attorney Three's W-9 form, and "a hold harmless regarding the liens" and Safe Auto stated it would then "immediately issue the check and release."

On October 8, 2012, Safe Auto provided Attorney Three with a release to execute in exchange for the payment of Safe Auto's policy limits. The release obligated Mueller to release any individual or entity from liability for the collision and required that Mueller would satisfy and indemnify all released entities for any claims or liens asserted.

On October 16, 2012, Attorney Two wrote again to Safe Auto, claiming to represent Mueller, and asking for more information to evaluate the $25,000 offer. The next day, Attorney Three emailed Safe Auto and said:

> It is my understanding that [Escabusa] was driving a vehicle he did not own. The accident report shows the accident vehicle was owned by his mother, [E.S.]. Under Missouri law his step[-]father's additional car insurance policy may stack with [] Safe Auto's policy. That is why we must use a Mo. Rev. St. 537.065 Contract to Limit Recovery.
>
> . . .
>
> The release also requires Mr. Mueller to satisfy/pay all liens and medical bills but Safe Auto is only paying $25,000. Mr. Mueller's medical bills far exceed that

---

[2] Section 537.065 permits "an injured party and a tort-feasor to agree that, if the injured party obtains a judgment against the tort-feasor, the injured party will seek to collect on the judgment only from 'the specific assets listed in the contract,' and from 'any insurer which insures the legal liability of the tort-feasor.'" *Knight by & through Knight v. Knight,* 609 S.W.3d 813, 821 (Mo. App. W.D. 2020) (quoting § 537.065.1).

4

amount of money. . . . This is without regard to sums that are in excess of $25,000. Please advise within the next ten (10) days as to whether Safe Auto will agree to enter into a Contract to Limit Recovery pursuant to Mo. Rev. St. 537.065 and disclose the name and address of [step-father's] other car insurance company.

No proposed "Contract to Limit Recovery pursuant to [section] 537.065" was attached to Attorney Three's email.

On October 24, 2012, Escabusa's defense counsel[3] wrote to Attorney Three and confirmed that the $25,000 limit under the Safe Auto policy remain offered and available to Mueller. Escabusa's counsel also advised that he had "no problem with limiting the [r]elease to language agreeable to both of us, nor d[id] [he] have a problem with a 537.065 agreement completely protecting [Escabusa]. . . ." Escabusa's counsel noted that Attorney Three's October 17 email did not include a proposed section 537.065 agreement and he requested "[p]lease provide your proposed Release/Agreement" so that he could discuss it with Escabusa.

That same day, Escabusa's counsel also wrote to Escabusa, following up on an in-person meeting with him about their firm's correspondence with Attorney Three regarding settlement. Counsel relayed to Escabusa that the letter to Mueller's attorney advised there were only two insurance policies which potentially provided coverage, Safe Auto and Columbia Insurance, and that they were "willing to execute an agreement protecting [Escabusa] for any further liability, should they agree to take the $25,000 offered by Safe Auto on [Escabusa's] behalf."

At some point in October 2012, Attorney Four[4] began communicating with Escabusa's counsel on Mueller's behalf. In letters dated October 29, 2012, and November 13, 2012, Escabusa's counsel wrote to Attorney Four stating that the $25,000 limit under the Safe Auto

---

[3] Safe Auto retained Escabusa's defense counsel pursuant to the insurance policy Escabusa had at the time of the accident.

[4] Attorney Three and Four were from the same law office.

5

policy remained offered and available to Mueller.  In the November 13 letter, Escabusa's counsel requested, again, that if there was a release or a section 537.065 agreement that Mueller wanted Escabusa to sign, to immediately provide the documents as these had not yet been provided.  Escabusa's counsel closed by stating that, "[s]o long as [Escabusa]'s financial interests and personal assets are protected, I believe we would be willing to move forward.  Again, I would like to see a copy of this document."

On November 20, 2012, Attorney Four emailed Escabusa's counsel a signed agreement in an unrelated case involving Progressive Insurance and unrelated individuals.  The exemplar included an agreement that those unrelated individuals would sue Progressive Insurance for bad faith.  The same day, Escabusa's counsel wrote back to Attorney Four questioning what the document was, because to him, the agreement did "not appear to be a [section] 537.065 agreement," but instead "a doctored agreement not to pursue personal assets."  Escabusa's counsel expressed confusion about a section 537.065 agreement that contemplated a defendant agreeing to sue his or her insurance company.  Escabusa's counsel asked that Attorney Four explain his reasoning for his request to include allowing Escabusa to sue Safe Auto.  Escabusa's counsel requested that Attorney Four send the actual agreement that Mueller wanted Escabusa to sign because, without this, counsel could not agree to it or advise Escabusa on the proposal.

That same day, Escabusa's counsel wrote to Escabusa providing him the "example" of the agreement that Attorney Four requested Escabusa sign.  Counsel advised Escabusa that Safe Auto offered the policy limits and that it requested further clarification from Attorney Four on the proposed agreement.

On December 17, 2012, after not receiving a response from Mueller's counsel, Escabusa's counsel again wrote to Attorney Four:

6

As I have said in every piece of correspondence e-mailed or faxed to your office, [Escabusa] is ready and willing to sign an agreement that limits recovery only to insurance proceeds. I am also happy to send you a Release upon which we both can agree. Based on the attached correspondence from Safe Auto, the $25,000.00 policy limits from Safe Auto remain offered and available. To date, I have not received anything for my client to sign. Without a proposed agreement, I cannot instruct my client on the things to which he is agreeing. Secondly, I still have not heard from you how Safe Auto "failed" to protect my client's financial interests when it offered the available policy limits. Can you please provide this information so I can discuss it with my client? I have done everything I know possible to resolve this case. I even personally called Columbia Insurance Group to open a claim and procure a copy of their policy.[5] I understand a copy was sent to you at my request.

After not receiving a response to its request from any of Mueller's attorneys that they provide a proposed section 537.065 agreement, Safe Auto's counsel drafted a proposed section 537.065 agreement and sent it to Attorney Four. Escabusa's counsel followed up on December 28, 2012, requesting that Attorney Four send an agreement for Escabusa to sign.

On February 8, 2013, March 27, 2013, May 1, 2013, and June 3, 2013, Escabusa's counsel wrote to Attorney Four reiterating that Escabusa was willing to enter into a section 537.065 agreement and asking Attorney Four to provide him with one that could be executed. Escabusa's counsel reiterated that Safe Auto continued to offer its $25,000 limits.

On May 21, 2013, Escabusa's counsel wrote to Escabusa updating him on the status of the matter. Counsel reiterated that he had sent monthly letters to opposing counsel stating their willingness to sign an agreement that limited recovery only to insurance proceeds, that the $25,000 policy limits from Safe Auto remain offered, but that he had not received a response from Mueller's counsel.

On September 4, 2013, Attorney Four sent a demand on Mueller's behalf to Safe Auto and to Columbia Mutual for a total of $250,000. On October 21, 2013, Mueller filed a lawsuit

---

[5] A family member of Escabusa's apparently had a Columbia Insurance policy under their name.

against Escabusa seeking to recover damages resulting from the May 2012 accident. Mueller appeared with Attorney Three and Attorney Four. Escabusa appeared with the same counsel provided by Safe Auto. The parties waived a jury trial, Mueller presented witnesses and evidence, and Escabusa presented no evidence. The court found Escabusa 100% at fault in causing the May 2012 accident. On October 5, 2015, the court entered a judgment in favor of Mueller and against Escabusa in the amount of $1,250,000 plus prejudgment interest. On November 3, 2015, the court entered an amended judgment setting the amount of prejudgment interest at $77,283.99.

On December 23, 2015, Mueller filed an amended petition for equitable garnishment against Escabusa, Safe Auto, and Columbia Mutual. On November 19, 2018, Escabusa filed a cross-claim against Safe Auto alleging, *inter alia*, that Safe Auto engaged in bad faith by failing and refusing to timely settle Mueller's claims and suits by paying Escabusa's liability limit of $25,000 to Mueller. Escabusa also alleged that Safe Auto failed and refused to notify Escabusa of all of Mueller's settlement offers and that Escabusa was deprived of the opportunities to protect his interest and to demand that Safe Auto protect Escabusa's interest by accepting Mueller's settlement offers.

In early June 2020, Safe Auto moved for summary judgment on Escabusa's cross-claim. Safe Auto filed its statement of uncontroverted material facts and accompanying suggestions in support. Safe Auto argued it was entitled to summary judgment on Escabusa's cross-claim because the undisputed facts demonstrated that Escabusa could not prove an essential element of his bad faith failure to settle claim—a clear and definite offer by Mueller to settle, release, and fully resolve Mueller's claims against Escabusa in exchange for Safe Auto's payment of its insurance policy limits.

8

Escabusa filed a response to Safe Auto's statement of material facts, suggestions in opposition, and its own statement of additional material facts. Escabusa argued that there were disputed issues of fact as to whether Safe Auto acted in bad faith in failing to settle Mueller's claim against Escabusa within the limits of the Safe Auto policy. Escabusa argued that on October 2, 2012, Safe Auto was given an opportunity to settle the claim by payment of the applicable policy limits with a section 537.065 agreement to limit recovery. Escabusa argued that this settlement offer would have provided Escabusa with financial protection from an excess judgment, but Safe Auto rejected this settlement offer and, in doing so, Safe Auto placed its own financial interests above the financial interests of its insured, Escabusa. Escabusa argued that this conduct demonstrated, at the least, that there were disputed issues of fact as to whether Safe Auto acted in bad faith when it rejected Mueller's offer to settle.

On July 18, 2022, the circuit court granted Safe Auto's motion for summary judgment on Escabusa's cross-claim. The circuit court concluded that Safe Auto was not liable for bad faith failure to settle. The court concluded that Safe Auto did not have a reasonable opportunity to settle the claims against Escabusa for the policy limits and that Safe Auto timely and repeatedly offered to pay its policy limits to effectuate a settlement of the claims against Escabusa.

Escabusa appeals.[6] Additional facts necessary to the disposition of the case are included below as we address Escabusa's specific allegations of error.

**Standard of Review**

The grant of summary judgment is an issue of law that an appellate court reviews *de novo. Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020); *Show-Me Inst. v. Off. of*

---

[6] Mueller subsequently dismissed, with prejudice, his equitable garnishment action against Safe Auto and "all claims as to all parties" including those against Escabusa. Mueller also dismissed, with prejudice, the claims against Columbia Mutual Insurance in July 2020.

9

*Admin.*, 645 S.W.3d 602, 607 (Mo. App. W.D. 2022). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law . . . ." Rule 74.04(c)(6).[7] "When reviewing the entry of summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Show-Me Inst.*, 645 S.W.3d at 604 n.2. A defending party may establish a right to summary judgment if it can show one of the following:

> (1) facts negating any one of the [plaintiff's] elements necessary for judgment; (2) that the [plaintiff], after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the [plaintiff's] elements; or (3) facts necessary to support [its] properly pleaded affirmative defense.

*Id.* at 607. This Court will affirm the circuit court's grant of summary judgment "if it is correct as a matter of law on any grounds." *Id.*

## Legal Analysis

### Points One and Two

In Escabusa's first and second points on appeal, Escabusa takes issue with two findings of fact in the circuit court's order granting summary judgment. In his first point on appeal, Escabusa argues that the circuit court erred in finding that a post-judgment agreement between Escabusa and Mueller provided Escabusa protection from execution of the underlying judgment. Escabusa contends that there is an absence of facts supporting this specific finding in the summary judgment record. In his second point on appeal, Escabusa argues that the circuit court erred in finding that all policy limit demands made by Mueller obligated Escabusa to enter into an agreement that required a judgment be entered against him. Escabusa argues that this finding

---

[7] Rule references are to the Missouri Supreme Court Rules (2020).

10

is unsupported by the summary judgment record because there was "at least one policy limits demand in which there was no requirement that a judgment be entered against [] Escabusa." We address points one and two together.

As relevant to Escabusa's first point, the circuit court's judgment included the following finding:

> [T]he Post-Judgment Agreement between the Crossclaim Plaintiff and [] Mueller is unambiguous and [] it provides the Crossclaim Plaintiff protection from execution of the Underlying Judgment. As such, the Post-Judgment Agreement cannot serve as evidence of damage, a necessary element of the Cross[-]claim.

We have reviewed the facts established pursuant to Rule 74.04(c)(1) and (2) and we agree with Escabusa that no facts in the summary judgment record discuss or reference any post-judgment agreement between Escabusa and Mueller. On appeal, Safe Auto acknowledges that the circuit court's specific finding referencing a "post-judgment agreement" is unsupported by the summary judgment record.

As relevant to Escabusa's second point, the circuit court's judgment stated:

> Moreover, because all of [] Mueller's policy-limit demands obligated the Crossclaim Plaintiff to enter into an agreement that required a judgment to be entered against him, it cannot be said that he has been subjected to a judgment in excess of the policy limits as a result of any action of Safe Auto.

Escabusa argues that there was "at least one policy limits demand in which there was no requirement that a judgment be entered against [] Escabusa." Safe Auto contends that the circuit court's finding was not erroneous because the October 2 email—while it did not include the word "judgment"—expressly incorporated "an agreed [section] 537.065 contract to limit recovery." Safe Auto reasons that because all of Mueller's settlement demands required the execution of a section 537.065 agreement, the circuit court made a reasonable assumption by stating in its order that "all" of Mueller's policy limit demands obligated Escabusa to enter into an agreement that required a judgment to be entered against him.

11

Regarding Escabusa's first point on appeal, we have already said—and Safe Auto acknowledges—no post-judgment agreement between Escabusa and Mueller was established in the summary judgment record. As to Escabusa's second point on appeal and the challenged statement in the circuit court's judgment, it is unnecessary for us to determine whether all of Mueller's policy-limit demands obligated Escabusa to enter into an agreement that required a judgment to be entered against him. The findings Escabusa challenges in his first and second points do not materially affect the merits of the action and inclusion of them in the circuit court's judgment does not constitute reversible error. In fact, in his brief, Escabusa does not argue that without these challenged findings there are insufficient facts to support the grant of summary judgment. Escabusa does not offer any compelling supporting argument that summary judgment was improper as a matter of law because the circuit court included these specific findings in its judgment.

Neither of the statements that Escabusa challenges in his first or second point require us to reverse the circuit court's summary judgment order. We first note that "trial courts have no fact-finding role in summary judgment, since 'it is not the "truth"' of the facts upon which the court focuses, but whether those facts are disputed." *Massie v. Colvin*, 373 S.W.3d 469, 471 (Mo. App. S.D. 2012) (quoting *ITT Com. Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 382 (Mo. banc 1993)). And, as we have already said, the grant of summary judgment is purely an issue of law that this Court reviews *de novo*. *Malin v. Cole Cnty. Prosecuting Att'y*, 565 S.W.3d 748, 752 (Mo. App. W.D. 2019). This Court's role "is to determine whether or not the trial court reached a proper result" and we will affirm an order granting summary judgment if it is sustainable on any theory. *Pecos I, LLC v. Meyer*, 655 S.W.3d 579, 585 (Mo. App. E.D. 2022) (citation omitted).

Because summary judgment may be affirmed if sustainable on any basis, we review the material facts, disputed or uncontroverted, established by the process set forth in Rule 74.04 to determine whether the circuit court erred in granting summary judgment. *Fleddermann v. Casino One Corp.*, 579 S.W.3d 244, 249 (Mo. App. E.D. 2019). Here, as discussed *infra*, summary judgment was appropriate because Escabusa was unable to prove an essential element of his bad faith failure to settle claim—that Safe Auto had a reasonable opportunity to settle Mueller's claim against Escabusa in exchange for Safe Auto's payment of the policy limits. Safe Auto, therefore, was entitled to judgment as a matter of law. Rule 74.04(c). This is true, regardless of, and without, the challenged findings in points one and two.

Points one and two are denied.

**Point Three**

In his third point, Escabusa argues that the circuit court erred in granting summary judgment because there was a question of fact as to whether Safe Auto acted in bad faith by rejecting a reasonable opportunity to settle Mueller's claim against Escabusa within the policy limits. Escabusa argues that the facts, viewed in the light most favorable to him, show that Safe Auto rejected an opportunity to settle the claim for the policy limits, as well as a section 537.065 agreement that would have protected Escabusa, and, instead insisted on a release not only for Escabusa, but also for itself and others.

An insurer owes a duty to its insured to act in good faith in settling a claim against the insured and, if that duty is breached, the insurer may be liable to the insured. *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 829 (Mo. banc 2014) (citing *Zumwalt v. Utilities Ins. Co.*, 228 S.W.2d 750, 753 (Mo. 1950)).

> [A] bad faith refusal to settle action will lie when a liability insurer: (1) reserves the exclusive right to contest or settle any claim; (2) prohibits the insured from

voluntarily assuming any liability or settling any claims without consent; and (3) is guilty of fraud or bad faith in refusing to settle a claim within the limits of the policy.

*Id.* at 827. The only element at issue in this case is element three, whether Safe Auto was guilty of bad faith in refusing to settle a claim within the limits of Escabusa's insurance policy.

An insurer may be liable for an excess judgment if it acts in bad faith "in refusing to settle [a] claim against its insured within its policy limits *when it has a chance to do so*." *Landie v. Century Indem. Co.,* 390 S.W.2d 558, 563 (Mo. App. 1965) (emphasis added). Therefore, "implicit in the 'refusing' aspect of the bad faith element is a showing that the insurer had a reasonable opportunity to settle within the policy limits." *Purscell v. Tico Ins. Co*., 790 F.3d 842, 847 (8th Cir. 2015) (applying Missouri law and citing *State Farm Fire & Cas. Co. v. Metcalf,* 861 S.W.2d 751, 756 (Mo. App. S.D. 1993)).

Escabusa contends that Attorney Three's October 2, 2012, email provided Safe Auto a reasonable opportunity to settle the claim against Escabusa for the policy limits and the chance to protect Escabusa from an excess judgment. Escabusa argues that at a minimum, whether Safe Auto had an opportunity to settle Mueller's claim against Escabusa within the policy limits was a disputed issue of fact and that summary judgment was improperly granted. Escabusa argues that by rejecting the October 2 "offer," Safe Auto placed its own financial interests above his. Escabusa also contends that a reasonable juror could conclude that Safe Auto acted in bad faith. We disagree that the October 2 email constituted a reasonable offer to settle the case for an amount within Escabusa's policy limits. We also conclude that Safe Auto did not act in bad faith.

Here, Attorney Three's October 2 email and its purported "offer" did not provide Safe Auto with a reasonable opportunity to settle. The October 2 correspondence was not sufficiently definite. "An offer must be so definite in its terms, or require such definite terms in the

14

acceptance, that the promises and performances to be rendered by each party are reasonably certain." *Brown v. Donham*, 900 S.W.2d 630, 633 (Mo. banc 1995) (internal quotations and citations omitted). *See also Sansone Law, LLC v. J&M Secs., LLC*, 589 S.W.3d 74, 87 (Mo. App. E.D. 2019). The October 2 email sought information about all motor vehicle policies that Escabusa and his family had in effect at the time of the wreck, and stated that if the requested information was provided, then Mueller would "settle with [Escabusa] for the total insurance coverages under all applicable policies with an agreed to [section] 537.065 contract to limit recovery." Safe Auto could not accept an offer on behalf of other, and, at the time, unidentified insurance companies and policy limits. *See Bonner v. Auto. Club Inter–Ins. Exch.,* 899 S.W.2d 925, 928 (Mo. App. E.D. 1995) (stating that a plaintiff's demands did "not rise to the level of demanding settlement within the policy limits" as the demands were "overly vague as to what settlement [was] sought").

Additionally, there was not a definite offer to settle and Safe Auto did not have a reasonable opportunity to settle because Mueller never provided the section "537.065 contract to limit recovery" for Escabusa's counsel to review and sign. Attorney Three's October 2 email proposed execution of what Attorney Three termed an "agreed to Mo. Rev. Stat [section] 537.065 contract to limit recovery," and gave a ten-day deadline for acceptance. This email, however, did not include a proposed section 537.065 agreement and did not further elaborate on the agreement's specific terms. Mueller's counsel never provided a draft of his proposed section 537.065 agreement for Escabusa's counsel to consider. Escabusa's counsel repeatedly requested that Mueller's counsel provide a copy of the proposed agreement so that it could evaluate the proposal with Escabusa, but Mueller's counsel never did. Mueller's counsel only provided an agreement from an unrelated case involving completely unrelated parties, and then never

15

elaborated on why that was sent or what it meant for the Mueller and Escabusa case. Mueller's counsel's conduct was—or, at the very least, contributed significantly to—the reason the underlying case was not settled for the insurance policy limits, not Safe Auto's.[8]

Mueller did not make a demand to Safe Auto that included the specific promises and performances required of each party to the agreement. Mueller, therefore, never made a clear and definite settlement offer. Thus, Safe Auto did not have a reasonable opportunity to settle the case for an amount within Escabusa's insurance policy limits. Not having had a reasonable opportunity to settle the claim within the policy limits, Safe Auto could not have refused to do so. *See Metcalf*, 861 S.W.2d at 756. Mueller's argument hinges on the October 2 email as the "offer to settle" that Safe Auto purportedly refused to accept, thereby acting in bad faith. This argument, however, completely ignores the multiple times subsequent to that where Safe Auto offered to settle for the policy limits with the agreement Mueller demanded, but never provided.

Further, the undisputed facts established that Safe Auto acted in good faith in its attempts to settle the case for an amount within Escabusa's policy limits. Attorney Three requested information in the October 2 email, and Safe Auto promptly responded only two days later with the information. Safe Auto also referenced a "release" which it promptly provided to Attorney Three. When Attorney Three expressed "concerns" about the proposed release, Escabusa's counsel responded on October 24, 2012, and advised Attorney Three that he had no problem

---

[8] We note that correspondence from Mueller's counsel soon after the accident indicated counsel's resoluteness to file a lawsuit in the matter. In a July 19, 2012, letter, Attorney One accepted Safe Auto's $25,000 policy limits offer but told Safe Auto they "reserve[d] the right to seek further legal action against your insured for the additional actual damages." In another letter that same day, Attorney One advised Safe Auto that he was "doubtful that we will be able to avoid a lawsuit in this situation." Last, in an August 15, 2012, phone call with Safe Auto, Attorney One said "he will definitely have to file suit as there is nothing that can be done with the bills."

16

modifying the release so that it was agreeable to both Safe Auto and Mueller. Additionally, Escabusa's counsel advised Mueller's attorney that it was agreeable to executing a section 537.065 agreement "completely protecting" Escabusa. On November 3, 2012, Escabusa's counsel reiterated to Attorney Four his willingness to review a release provided by Mueller. No such release nor an applicable section 537.065 agreement was ever provided by Mueller.

Here, the undisputed facts demonstrated that for approximately one year, after initially offering the policy limits, Mueller's counsel was advised no less than nine times that Safe Auto's policy limits offer remained. Mueller's various attorneys continued to request information from Safe Auto, Attorney Three asked for the parties to enter into a section 537.065 agreement yet never sent a proposed agreement to Escabusa's counsel, and, when Escabusa's counsel drafted a proposed section 537.065 agreement, Mueller's counsel did not respond to the proposal. Escabusa's counsel repeatedly requested that Mueller's counsel send a release or the section 537.065 agreement for consideration, but to no avail. The summary judgment record establishes that Escabusa's counsel requested that Mueller's counsel send their proposed section 537.065 agreement no less than eight times, but Mueller did not. From the record, it is undisputed that Safe Auto did not act in bad faith and Mueller's various counsel simply refused Safe Auto's attempts to pay its policy limits to release Escabusa.

Safe Auto did not, as a matter of law, engage in bad faith with respect to settling the claim against its insured, Escabusa. Accordingly, Safe Auto was entitled to summary judgment on Escabusa's bad faith failure to settle cross-claim. Point three is denied.

17

## Conclusion

The circuit court's judgment is affirmed.

_____
**Janet Sutton, Judge**

Lisa White Hardwick, P.J. and Gary D. Witt, J. concur.